WOOD, Chief Judge.
Title VII of the Civil Rights Act of 1964 makes it unlawful for employers subject to the Act to discriminate on the basis of a person’s “race, color, religion, sex, or national origin....” 42 U.S.C. § 2000e-2(a). For many years, the courts of appeals of this country understood the prohibition against sex discrimination to exclude discrimination on the basis of a person’s sexual orientation. The Supreme Court, however, has never spoken to that question. In this case, we have been asked to take a *341 fresh look at our position in light of developments at the Supreme Court extending over two decades. We have done so, and we conclude today that discrimination on the basis of sexual orientation is a form of sex discrimination. We therefore reverse the district court’s judgment dismissing Kimberly Hively’s suit against Ivy Tech Community College and remand for further proceedings.
I
Hively is openly lesbian. She began teaching as a part-time, adjunct professor at Ivy Tech Community College’s South Bend campus in 2000. Hoping to improve her lot, she applied for at least six full-time positions between 2009 and 2014. These efforts were unsuccessful; worse yet, in July 2014 her part-time contract was not renewed. Believing that Ivy Tech was spurning her because of her sexual orientation, she filed a pro se charge with the Equal Employment Opportunity Commission on December 13, 2013. It was short and to the point:
I have applied for several positions at IVY TECH, fulltime, in the last 5 years. I believe I am being blocked from full-time employment without just cause. I believe I am being discriminated against based on my sexual orientation. I believe I have been discriminated against and that my rights under Title VII of the Civil Rights Act of 1964 were violated.
After receiving a right-to-sue letter, she filed this action in the district court (again acting pro se). Ivy Tech responded with a motion to dismiss for failure to state a claim on which relief can be granted. It argued that sexual orientation is not a protected class under Title VII or 42 U.S.C. § 1981 (which we will disregard for the remainder of this opinion). Relying on a line of this court’s cases exemplified by Hamner v. St. Vincent Hosp. and Health Care Ctr., Inc., 224 F.3d 701 (7th Cir. 2000), the district court granted Ivy Tech’s motion and dismissed Hively’s case with prejudice.
Now represented by the Lambda Legal Defense & Education Fund, Hively has appealed to this court. After an exhaustive exploration of the law governing claims involving discrimination based on sexual orientation, the panel affirmed. Hively v. Ivy Tech Cmty. Coll., 830 F.3d 698 (7th Cir. 2016). It began its analysis by noting that the idea that discrimination based on sexual orientation is somehow distinct from sex discrimination originated with dicta in Ulane v. Eastern Airlines, Inc., 742 F.2d 1081 (7th Cir. 1984). Ulane stated (as if this resolved matters) that Title VII’s prohibition against sex discrimination “implies that it is unlawful to discriminate against women because they are women and against men because they are men.” Id. at 1085. From this truism, we deduced that “Congress had nothing more than the traditional notion of ‘sex’ in mind when it voted to outlaw sex discrimination. ...” Doe v. City of Belleville, Ill., 119 F.3d 563, 572 (7th Cir. 1997), cert. granted, judgment vacated sub nom. City of Belle-ville v. Doe, 523 U.S. 1001, 118 S.Ct. 1183, 140 L.Ed.2d 313 (1998), abrogated by Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).
Later cases in this court, including Hamm v. Weyauwega Milk Prods., 332 F.3d 1058 (7th Cir. 2003), Hamner, and Spearman v. Ford Motor Co., 231 F.3d 1080, 1085 (7th Cir. 2000), have accepted this as settled law. Almost all of our sister circuits have understood the law in the same way. See, e.g., Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 259 (1st Cir. 1999); Dawson v. Bumble & Bumble, 398 F.3d 211, 217 (2d Cir. 2005); Prowel v. Wise Bus. Forms, Inc., 579 F.3d 285, *342 290 (3d Cir. 2009); Wrightson v. Pizza Hut of Am., Inc., 99 F.3d 138, 143 (4th Cir. 1996); Blum v. Gulf Oil Corp., 597 F.2d 936, 938 (5th Cir. 1979); Kalich v. AT&T Mobility, LLC, 679 F.3d 464, 471 (6th Cir. 2012); Williamson v. A.G. Edwards & Sons, Inc., 876 F.2d 69, 70 (8th Cir. 1989); Medina v. Income Support Div., 413 F.3d 1131, 1135 (10th Cir. 2005); Fredette v. BVP Mgmt. Assocs., 112 F.3d 1503, 1510 (11th Cir. 1997). A panel of the Eleventh Circuit, recognizing that it was bound by the Fifth Circuit’s precedent in Blum, 597 F.2d 936, recently reaffirmed (by a 2-1 vote) that it could not recognize sexual orientation discrimination claims under Title VII. Evans v. Georgia Reg’l Hosp., 850 F.3d 1248,1255-57 (11th Cir. 2017). On the other hand, the Second Circuit recently found that an openly gay male plaintiff pleaded a claim of gender stereotyping that was sufficient to survive dismissal. The court observed that one panel lacked the power to reconsider the court’s earlier decision holding that sexual orientation discrimination claims were not cognizable under Title VII. Christiansen v. Omnicom Group, Inc., No. 16-748, 852 F.3d 195, 2017 WL 1130183 (2d Cir. Mar. 27, 2017) (per curiam). Nonetheless, two of the three judges, relying on many of the same arguments presented here, noted in concurrence that they thought their court ought to consider revisiting that precedent in an appropriate case. Id. at 198-99, 2017 WL 1130183 at *2 (Katzmann, J., concurring). Notable in its absence from the debate over the proper interpretation of the scope of Title VII’s ban on sex discrimination is the United States Supreme Court.
That is not because the Supreme Court has left this subject entirely to the side. To the contrary, as the panel recognized, over the years the Court has issued several opinions that are relevant to the issue before us. Key among those decisions are Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), and Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Price Waterhouse held that the practice of gender stereotyping falls within Title VII’s prohibition against sex discrimination, and Oncale clarified that it makes no difference if the sex of the harasser is (or is not) the same as the sex of the victim. Our panel frankly acknowledged how difficult it is “to extricate the gender nonconformity claims from the sexual orientation claims.” 830 F.3d at 709. That effort, it commented, has led to a “confused hodge-podge of cases.” Id. at 711. It also noted that “all gay, lesbian and bisexual persons fail to comply with the sine qua non of gender stereotypes — that all men should form intimate relationships only with women, and all women should form intimate relationships only with men.” Id. Especially since the Supreme Court’s recognition that the Due Process and Equal Protection Clauses of the Constitution protect the right of same-sex couples to marry, Obergefell v. Hodges, - U.S. -, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015), bizarre results ensue from the current regime. As the panel noted, it creates “a paradoxical legal landscape in which a person can be married on Saturday and then fired on Monday for just that act.” 830 F.3d at 714. Finally, the panel highlighted the sharp tension between a rule that fails to recognize that discrimination on the basis of the sex with whom a person associates is a form of sex discrimination, and the rule, recognized since Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), that discrimination on the basis of the race with whom a person associates is a form of racial discrimination.
Despite all these problems, the panel correctly noted that it was bound by this court’s precedents, to which we referred *343 earlier. It thought that the handwriting signaling their demise might be on the wall, but it did not feel empowered to translate that message into a holding. “Until the writing comes in the form of a Supreme Court opinion or new legislation,” 830 F.3d at 718, it felt bound to adhere to our earlier decisions. In light of the importance of the issue, and recognizing the power of the full court to overrule earlier decisions and to bring our law into conformity with the Supreme Court’s teachings, a majority of the judges in regular active service voted to rehear this case en banc.
II
A
The question before us is not whether this court can, or should, “amend” Title YII to add a new protected category to the familiar list of “race, color, religion, sex, or national origin.” 42 U.S.C. § 2000e-2(a). Obviously that lies beyond our power. We must decide instead what it means to discriminate on the basis of sex, and in particular, whether actions taken on the basis of sexual orientation are a subset of actions taken on the basis of sex.[1] This is a pure question of statutory interpretation and thus well within the judiciary’s competence.
Much ink has been spilled about the proper way to go about the task of statutory interpretation. One can stick, to the greatest extent possible, to the language enacted by the legislature; one could consult the legislative history that led up to the bill that became law; one could examine later actions of the legislature (ie. efforts to amend the law and later enaet-ments) for whatever light they may shed; and one could use a combination of these methods. See, e.g., William Eskridge, Jr., & Philip Frickey, Legislation and Statutory Interpretation (2d ed. 2007); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012); Adrian Vermeule, Judging Under Uncertainty: An Institutional Theory of Legal Interpretation (2006); Victoria F. Nourse, A Decision Theory of Statutory Interpretation: Legislative History by the Rules, 122 Yale L.J. 70 (2012); Cass R. Sunstein, Interpreting Statutes in the Regulatory State, 103 Harv. L. Rev. 407 (1989).
Few people would insist that there is a need to delve into secondary sources if the statute is plain on its face. Even if it is not pellucid, the best source for disambiguation is the broader context of the statute that the legislature — in this case, Congress — passed. This is uncontroversial when the reading seems consistent with the conventional wisdom about the reach of the law. It becomes somewhat harder to swallow if the language reveals suspected or actual unintended consequences. It is then that some have thought that legislative history should be used to block a particular reading of a statute. Legislative history, however, is notoriously malleable. Even worse is the temptation to try to divine the significance of unsuccessful legislative efforts to change the law. Those failures can mean almost anything, ranging from the lack of necessity for a proposed change because the law already accomplishes the desired goal, to the undesirability of the change because a majority of the legislature is happy with the way the courts are currently interpreting *344 the law, to the irrelevance of the non-enactment, when it is attributable to nothing more than legislative logrolling or gridlock that had nothing to do with its merits.
Ivy Tech sets great store on the fact that Congress has frequently considered amending Title VII to add the words “sexual orientation” to the list of prohibited characteristics, yet it has never done so. Many of our sister circuits have also noted this fact. In our view, however, it is simply too difficult to draw a reliable inference from these truncated legislative initiatives to rest our opinion on them. The goalposts have been moving over the years, as the Supreme Court has shed more light on the scope of the language that already is in the statute: no sex discrimination.
The dissent makes much of the fact that Congresses acting more than thirty years after the passage of Title VII made use of the term “sexual orientation” to prohibit discrimination or violence on that basis in statutes such as the Violence Against Women Act and the federal Hate Crimes Act. But this gets us no closer to answering the question at hand, for Congress may certainly choose to use both a belt and suspenders to achieve its objectives, and the fact that “sex” and “sexual orientation” discrimination may overlap in later statutes is of no help in determining whether sexual orientation discrimination is discrimination on the basis of sex for the purposes of Title VII. See, e.g., McEvoy v. IEI Barge Servs., Inc., 622 F.3d 671, 677 (7th Cir. 2010) (“Congress may choose a belt-and-suspenders approach to promote its policy objectives....”).
Moreover, the agency most closely associated with this law, the Equal Employment Opportunity Commission, in 2015 announced that it now takes the position that Title VTI’s prohibition against sex discrimination encompasses discrimination on the basis of sexual orientation. See Baldwin v. Foxx, EEOC Appeal No. 0120133080, 2015 WL 4397641 (July 15, 2015). Our point here is not that we have a duty to defer to the EEOC’s position. We assume for present purposes that no such duty exists. But the Commission’s position may have caused some in Congress to think that legislation is needed to carve sexual orientation out of the statute, not to put it in. In the end, we have no idea what inference to draw from congressional inaction or later enactments, because there is no way of knowing what explains each individual member’s votes, much less what explains the failure of the body as a whole to change this 1964 statute.
Our interpretive task is guided instead by the Supreme Court’s approach in the closely related case of Oncale, where it had this to say as it addressed the question whether Title VII covers sexual harassment inflicted by a man on a male victim:
We see no justification in the statutory language or our precedents for a categorical rule excluding same-sex harassment claims from the coverage of Title VII. As some courts have observed, male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed. Title VII prohibits “discri-minat[ion] ... because of ... sex” in the “terms” or “conditions” of employment. Our holding that this includes sexual harassment must extend to sexual harassment of any kind that meets the statutory requirements.
*345 523 U.S. at 79-80, 118 S.Ct. 998. The Court could not have been clearer: the fact that the enacting Congress may not have anticipated a particular application of the law cannot stand in the way of the provisions of the law that are on the books.
It is therefore neither here nor there that the Congress that enacted the Civil Rights Act in 1964 and chose to include sex as a prohibited basis for employment discrimination (no matter why it did so) may not have realized or understood the full scope of the words it chose. Indeed, in the years since 1964, Title VII has been understood to cover far more than the simple decision of an employer not to hire a woman for Job A, or a man for Job B. The Supreme Court has held that the prohibition against sex discrimination reaches sexual harassment in the workplace, see Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 106 S.Ct. 2899, 91 L.Ed.2d 49 (1986), including same-sex workplace harassment, see Oncale; it reaches discrimination based on actuarial assumptions about a person’s longevity, see City of Los Angeles, Dep’t of Water and Power v. Manhart, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978); and it reaches discrimination based on a person’s failure to conform to a certain set of gender stereotypes, see Hopkins. It is quite possible that these interpretations may also have surprised some who served in the 88th Congress. Nevertheless, experience with the law has led the Supreme Court to recognize that each of these examples is a covered form of sex discrimination.
B
Hively offers two approaches in support of her contention that “sex discrimination” includes discrimination on the basis of sexual orientation. The first relies on the tried-and-true comparative method in which we attempt to isolate the significance of the plaintiffs sex to the employer’s decision: has she described a situation in which, holding all other things constant and changing only her sex, she would have been treated the same way? The second relies on the Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), line of cases, which she argues protect her right to associate intimately with a person of the same sex. Although the analysis differs somewhat, both avenues end up in the same place: sex discrimination.
1
It is critical, in applying the comparative method, to be sure that only the variable of the plaintiffs sex is allowed to change. The fundamental question is not whether a lesbian is being treated better or worse than gay men, bisexuals, or transsexuals, because such a comparison shifts too many pieces at once. Framing the question that way swaps the critical characteristic (here, sex) for both the complainant and the comparator and thus obscures the key point — whether the complainant’s protected characteristic played a role in the adverse employment decision. The counterfactual we must use is a situation in which Hively is a man, but everything else stays the same: in particular, the sex or gender of the partner.
Hively alleges that if she had been a man married to a woman (or living with a woman, or dating a woman) and everything else had stayed thé same, Ivy Tech would not have refused to promote her and would not have fired her. (We take the facts in the light most favorable to her, because we are here on a Rule 12(b)(6) dismissal; naturally nothing we say will prevent Ivy Tech from contesting these points in later proceedings.) This describes paradigmatic sex discrimination. To use the phrase from Ulane, Ivy Tech is disadvantaging her because she is a woman. *346 Nothing in the complaint hints that Ivy-Tech has an anti-marriage policy that extends to heterosexual relationships, or for that matter even an anti-partnership policy that is gender-neutral.
Viewed through the lens of the gender non-conformity line of cases, Hively represents the ultimate case of failure to conform to the female stereotype (at least as understood in a place such as modern America, which views heterosexuality as the norm and other forms of sexuality as exceptional): she is not heterosexual. Our panel described the line between a gender nonconformity claim and one based on sexual orientation as gossamer-thin; we conclude that it .does not exist at all. Hively’s claim is no different from the claims brought by women who were rejected for jobs in traditionally male workplaces, such as fire departments, construction, and policing. The employers in those cases were policing the boundaries of what jobs or behaviors they found acceptable for a woman (or in some cases, for a man).
This was the critical point that the Supreme Court was making in Hopkins. The four justices in the plurality and the two justices concurring in the judgment recognized that Hopkins had alleged that her employer was discriminating only against women who behaved in what the employer viewed as too “masculine” a way — no makeup, no jewelry, no fashion sense.[2] And even before Hopkins, courts had found sex discrimination in situations where women were resisting stereotypical roles. As far back as 1971, the Supreme Court held that Title VII does not permit an employer to refuse to hire women with pre-school-age children, but not men. Phillips v. Martin Marietta Corp., 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971). Around the same time, this court held that Title VII “strike[s] at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes,” Sprogis v. United Air Lines, Inc., 444 F.2d 1194, 1198 (7th Cir. 1971), and struck down a rule requiring only the female employees to be unmarried. In both those instances, the employer’s rule did not affect every woman in the workforce. Just so here: a policy that discriminates on the basis of sexual orientation does not affect every woman, or every man, but it is based on assumptions about the proper behavior for someone of a given sex.[3] The discriminato *347 ry behavior does not exist without taking the victim’s biological sex (either as observed at birth or as modified, in the case of transsexuals) into account. Any discomfort, disapproval, or job decision based on the fact that the complainant — woman or man — dresses differently, speaks differently, or dates or marries a same-sex partner, is a reaction purely and simply based on sex. That means that it falls within Title VII’s prohibition against sex discrimination, if it affects employment in one of the specified ways.
The virtue of looking at comparators and paying heed to gender non-conformity is that this process sheds light on the interpretive question raised by Hively’s ease: is sexual-orientation discrimination a form of sex discrimination, given the way in which the Supreme Court has interpreted the word “sex” in the statute? The dissent criticizes us for not trying to rule out sexual-orientation discrimination by controlling for it in our comparator example and for not placing any weight on the fact that if someone had asked Ivy Tech what its reasons were at the time of the discriminatory conduct, it probably would have said “sexual orientation,” not “sex.” We assume that this is true, but this thought experiment does not answer the question before us — instead, it begs that question. It commits the logical fallacy of assuming the conclusion it sets out to prove. It makes no sense to control for or rule out discrimination on the basis of sexual orientation if the question before us is whether that type of discrimination is nothing more or less than a form of sex discrimination. Repeating that the two are different, as the dissent does at numerous points, also does not advance the analysis.
2
As we noted earlier, Hively also has argued that action based on sexual orientation is sex discrimination under the associational theory. It is now accepted that a person who is discriminated against because of the protected characteristic of one with whom she associates is actually being disadvantaged because of her own traits. This line of cases began with Loving, in which the Supreme Court held that “restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause.” 388 U.S. at 12, 87 S.Ct. 1817. The Court rejected the argument that miscegenation statutes do not violate equal protection because they “punish equally both the white and the Negro participants in an interracial marriage.” Id. at 8, 87 S.Ct. 1817. When dealing with a statute containing racial classifications, it wrote, “the fact of equal application does not immunize the statute from the very heavy burden of justification” required by the Fourteenth Amendment for lines drawn by race. Id. at 9, 87 S.Ct. 1817.
In effect, both parties to the interracial marriage were being denied important rights by the state solely on the basis of their race. This point by now has been recognized for many years. For example, in Parr v. Woodmen of the World Life Ins. Co., 791 F.2d 888 (11th Cir. 1986), the Eleventh Circuit considered a case in which a white man (Parr) married to an African-American woman was denied employment by an insurance company because of his interracial marriage. He sued under Title VII, but the district court dismissed the complaint on the ground that it failed to describe discrimination on the basis of race. The court of appeals reversed. It held that “[w]here a plaintiff *348 claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of his race.” Id. at 892. It also rejected the employer’s somewhat bizarre argument that, given the allegation that it discriminated against all African-Americans, Parr could not show that it would have made a difference if he also had been African-American. Id. The court contented itself with describing that as a lawsuit for another day.
The Second Circuit took the same position two decades later in Holcomb v. Iona Coll., 521 F.3d 130 (2d Cir. 2008), in which a white former employee of the college sued, alleging that it fired him from his job as associate coach of the men’s basketball team because he was married to an African-American woman. The court held “that an employer may violate Title VII if it takes action against an employee because of the employee’s association with a person of another race.” Id. at 132. It stressed that the plaintiffs case did not depend on third-party injury. To the contrary, it held, “where an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee’s own race.” Id. at 139. Had the plaintiff been African-American, the question whether race discrimination tainted the employer’s action would have depended on different facts.
We have not faced exactly the same situation as that in Parr and Holcomb, but we have come close. In Drake v. Minn. Mining & Mfg. Co., 134 F.3d 878 (7th Cir. 1998), we encountered a case in which white employees brought an action under Title VII on the theory that they were being subjected to a hostile working environment and ultimately discharged because of their association with African-American co-workers. Because the defendant conceded that an employee can bring an associational race discrimination claim under Title VII, we had no need to say much on that point. Instead, we assumed for the sake of argument that an associational race discrimination claim is possible, and that the key inquiries are whether the employee has experienced discrimination and whether that discrimination was because of race. Id. at 884. This is consistent with Holcomb.
The fact that we now accept this analysis tells us nothing, however, about the world in 1967, when Loving reached the Supreme Court. The dissent implies that we are adopting an anachronistic view of Title VII, enacted just three years before Loving, but it is the dissent’s understanding of Loving and the miscegenation laws that is an anachronism. Thanks to Loving and the later cases we mentioned, society understands now that such laws are (and always were) inherently racist. But as of 1967 (and thus as of 1964), Virginia and 15 other states had anti-miscegenation laws on the books. Loving, 388 U.S. at 6, 87 S.Ct. 1817. These laws were long defended and understood as non-discriminatory because the legal obstacle affected both partners. The Court in Loving recognized that equal application of a law that prohibited conduct only between members of different races did not save it. Changing the race of one partner made a difference in determining the legality of the conduct, and so the law rested on “distinctions drawn according to race,” which were unjustifiable and racially discriminatory.[4] *349 Loving, 388 U.S. at 11, 87 S.Ct. 1817. So too, here. If we were to change the sex of one partner in a lesbian relationship, the outcome would be different. This reveals that the discrimination rests on distinctions drawn according to sex.
The dissent would instead have us compare the treatment of men who are attracted to members of the male sex with the treatment of women who are attracted to members of the female sex, and ask whether an employer treats the men differently from the women. But even setting to one side the logical fallacy involved, Loving shows why this fails. In the context of interracial relationships, we could just as easily hold constant a variable such as “sexual or romantic attraction to persons of a different race” and ask whether an employer treated persons of different races who shared that propensity the same. That is precisely the rule that Loving rejected, and so too must we, in the context of sexual associations.
The fact that Loving, Parr, and Holcomb deal with racial associations, as opposed to those based on color, national origin, religion, or sex, is of no moment. The text of the statute draws no distinction, for this purpose, among the different varieties of discrimination it addresses — a fact recognized by the Hopkins plurality. See 490 U.S. at 244 n.9, 109 S.Ct. 1775. This means that to the extent that the statute prohibits discrimination on the basis of the race of someone with whom the plaintiff associates, it also prohibits discrimination on the basis of the national origin, or the color, or the religion, or (as relevant here) the sex of the associate. No matter which category is involved, the essence of the claim is that the plaintiff would not be suffering the adverse action had his or her sex, race, color, national origin, or religion been different.
Ill
Today’s decision must be understood against the backdrop of the Supreme Court’s decisions, not only in the field of employment discrimination, but also in the area of broader discrimination on the basis of sexual orientation. We already have discussed the employment cases, especially Hopkins and Oncale. The latter line of cases began with Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), in which the Court held that a provision of the Colorado Constitution forbidding any organ of government in the state from taking action designed to protect “homosexual, lesbian, or bisexual” persons, id. at 624, 116 S.Ct. 1620, violated the federal Equal Protection Clause. Romer was followed by Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), in which the Court found that a Texas statute criminalizing homosexual intimacy between consenting adults violated the liberty provision of the Due Process Clause. Next came United States v. Windsor, — U.S. -, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013), which addressed the constitutionality of the part of the Defense of Marriage Act (DOMA) that excluded a same-sex partner from the definition of “spouse” in other federal statutes. The Court held that this part of DOMA “violate[d] basic due process and equal protection principles applicable to the Federal Government.” Id. at 2693. Finally, the Court’s decision in Obergefell, supra, held that the right to marry is a fundamental liberty right, protected by the Due Process *350 and Equal Protection Clauses of the Fourteenth Amendment. 135 S.Ct. at 2604. The Court wrote that “[i]t is now clear that the challenged laws burden the liberty of same-sex couples, and it must be further acknowledged that they abridge central precepts of equality.” Id.
It would require considerable calisthenics to remove the “sex” from “sexual orientation.” The effort to do so has led to confusing and contradictory results, as our panel opinion illustrated so well.[5] The EEOC concluded, in its Baldwin decision, that such an effort cannot be reconciled with the straightforward language of Title VII. Many district courts have come to the same conclusion. See, e.g., Boutillier v. Hartford Pub. Sch., No. 3:13-CV-01303-WWE, 221 F.Supp.3d 255, 2016 WL 6818348 (D. Conn. Nov. 17, 2016); U.S. Equal Emp’t Opportunity Comm’n v. Scott Med. Ctr., P.C., No. CV 16-225, 217 F.Supp.3d 834, 2016 WL 6569233 (W.D. Pa. Nov. 4, 2016); Winstead v. Lafayette Cnty. Bd. of Cnty. Comm’rs, 197 F.Supp.3d 1334 (N.D. Fla. 2016); Isaacs v. Felder Servs., LLC, 143 F.Supp.3d 1190 (M.D. Ala. 2015); see also Videckis v. Pepperdine Univ., 150 F.Supp.3d 1151 (C.D. Cal. 2015) (Title IX case, applying Title VII principles and Baldwin). Many other courts have found that gender-identity claims are cognizable under Title VII. See, e.g., Rosa v. Park W. Bank & Tr. Co., 214 F.3d 213, 215-16 (1st Cir. 2000) (claim for sex discrimination under Equal Credit Opportunity Act, analogizing to Title VII); Schwenk v. Hartford, 204 F.3d 1187, 1201-02 (9th Cir. 2000) (relying on Title VII cases to conclude that violence against a transsexual was violence because of gender under the Gender Motivated Violence Act); Barnes v. City of Cincinnati, 401 F.3d 729 (6th Cir. 2005); Smith v. City of Salem, Ohio, 378 F.3d 566 (6th Cir. 2004); Fabian v. Hosp. of Cent. Conn., 172 F.Supp.3d 509 (D. Conn. 2016); Schroer v. Billington, 577 F.Supp.2d 293, 308 (D.D.C. 2008).
This is not to say that authority to the contrary does not exist. As we acknowledged at the outset of this opinion, it does. But this court sits en banc to consider what the correct rule of law is now in light of the Supreme Court’s authoritative interpretations, not what someone thought it meant one, ten, or twenty years ago.[6] The *351 logic of the Supreme Court’s decisions, as well as the common-sense reality that it is actually impossible to discriminate on the basis of sexual orientation without discriminating on the basis of sex, persuade us that the time has come to overrule our previous cases that have endeavored to find and obsérve that line.
For the sake of comprehensiveness, we note that Ivy Tech presents two technical reasons why it thinks this case should not be heard: waiver and sovereign immunity. Neither one persuades us. Though Hively (acting pro se) did not advance the same arguments to the district court, that court would have been powerless to overturn precedent. We, in contrast, are proceeding on a de novo basis, and we have the discretion to address issues for the first time on appeal. Kaczmarek v. Rednour, 627 F.3d 586, 595 (7th Cir. 2010). We often exercise that discretion to entertain arguments that turn on pure issues of law. See, e.g., Amcast Indus. Corp. v. Detrex Corp., 2 F.3d 746, 750 (7th Cir. 1993) (concluding “[t]here will be no better time to resolve the issue than now.”). There was no waiver. As for sovereign immunity, Ivy Tech acknowledges that federal courts have long concluded that Congress validly abrogated the state’s immunity with respect to intentional discrimination claims under Title VII. Fitzpatrick v. Bitzer, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); Nanda v. Bd. of Trs. of Univ. of Ill., 303 F.3d 817, 831 (7th Cir. 2002). There is no merit whatsoever to that point.
We close by noting that we have decided only the issue put before us. Additional complications can be saved for another day, when they are actually involved in the case. Ivy Tech did not contend, for example, that it was a religious institution and the positions it denied to Hively related to a religious mission.[7] See 42 U.S.C. § 2000e-l(a). Nor have we had any occasion to consider the meaning of discrimination in the context of the provision of social or public services. We hold only that a person who alleges that she experienced employment discrimination on the basis of *352 her sexual orientation has put forth a case of sex discrimination for Title VII purposes. It was therefore wrong to dismiss Hively’s complaint for failure to state a claim. The judgment of the district court is Reversed and the case is Remanded for further proceedings.

. For present purposes, we have no need to decide whether discrimination on the basis of "gender” is for legal purposes the same as discrimination on the basis of "sex,” which is the statutory term. Many courts, including the Supreme Court, appear to have used "sex” and “gender” synonymously. Should a case arise in which the facts require us to examine the differences (if any) between the terms, we will do so then.

. The dissent correctly points out that Hopkins was a plurality opinion, but that fact is of no moment in understanding what we are to take from the plurality's discussion of sex stereotyping. On the critical issue — whether the conduct about which Hopkins complained could support a finding of sex discrimination for purposes of Title VII — at least six justices were in agreement that the answer was yes. Justice Brennan's opinion for the four-person plurality was clear: “In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender.” 490 U.S. at 250, 109 S.Ct. 1775. Justice White, concurring in the judgment, stated that he agreed that an unlawful motive was a substantial factor in the adverse employment action Hopkins suffered. Id. at 259, 109 S.Ct. 1775. Justice O’Connor, also concurring in the judgment, “agree[d] with the plurality that, on the facts presented in this case, the burden of persuasion should shift to the employer to demonstrate by a preponderance of the evidence that it would have reached the same decision concerning Ann Hopkins’ candidacy absent consideration of her gender.” Id. at 261, 109 S.Ct. 1775. Justice Kennedy’s dissenting opinion did not need to dwell on this point, because he found that Hopkins could not prove causation.

. The dissent questions in its conclusion what a jury ought to do in the hypothetical case in which Ivy Tech hired six heterosexual women for the full-time positions. But, as we note, the Supreme Court has made it clear that a policy need not affect every woman to constitute sex discrimination. What if Hively had been heterosexual, too, but did not get the job because she failed to wear high heels, lipstick, *347 or perfume like the other candidates? A failure to discriminate against all women does not mean that an employer has not discriminated against one woman on the basis of sex.

. The dissent seems to imply that the discrimination in Loving was problematic because the miscegenation laws were designed to maintain the supremacy of one race — and by extension that sexual orientation discrimination is not a problem because it is not designed to maintain the supremacy of one sex. But while this was certainly a repugnant fea *349 ture of Virginia’s law, it was not the basis of the holding in Loving. Rather, the Court found the racial classifications to be at odds with the Constitution, "even assuming an even-handed state purpose to protect the 'integrity' of all races.” Loving, 388 U.S. at 11 n.11, 87 S.Ct. 1817.

. The dissent contends that a fluent speaker of the English language would understand that "sex” does not include the concept of "sexual orientation,” and this ought to demonstrate that the two are easily distinguishable and not the same. But this again assumes the answer to the question before us: how to interpret the statute in light of the guidance the Supreme Court has provided. The dissent is correct that the term "sexual orientation” was not defined in the dictionary around the time of Title VII’s enactment, but neither was the term "sexual harassment” — a concept that, although it can be distinguished from "sex,” has at least since 1986 been included by the Supreme Court under the umbrella of sex discrimination. See Webster’s New Collegiate Dictionary (7th ed. 1963) (lacking an entry for "sexual harassment” or "sexual orientation”); The American Heritage Dictionary of the English Language (1st ed. 1969) (same). The dissent postulates that it is implausible that a reasonable person in 1964 could have understood discrimination based on sex to include sexual orientation discrimination. But that reasonable person similarly may not have understood it to include sexual harassment (and, by extension, not male-on-male sexual harassment). As Oncale said, we are concerned with the provisions of the law, not the principal concerns of those who wrote it. 523 U.S. at 80, 118 S.Ct. 998. The approach we have taken does just that.

. The dissent criticizes us for this approach, but we find nothing surprising in the fact that lower courts may have been wrong for many years in how they understood the rule of law supplied by a statute or the Constitution. Exactly this has happened before. For example, in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court disapproved a rule of statutory *351 interpretation that all eleven regional courts of appeals had followed — most for over three decades. When the Court decided Taniguchi v. Kan Pacific Saipan, Ltd., 566 U.S. 560, 132 S.Ct. 1997, 182 L.Ed.2d 903 (2012) (deciding that the provision for compensating interpreters in 28 U.S.C. § 1920(6) does not include costs for document translation), it rejected the views of at least six circuits with regard to the proper reading of the statute. 566 U.S. at 577, 132 S.Ct. 1997 (Ginsburg, J., dissenting). See also Milner v. Dep’t of the Navy, 562 U.S. 562, 585, 131 S.Ct. 1259, 179 L.Ed.2d 268 (2011) (Breyer, J., dissenting) (noting that the Court’s decision rejected the interpretation of Exemption 2 to the Freedom of Information Act that had been consistently followed or favorably cited by every court of appeals to have considered the matter over a 30-year period). It would be more controversial to assert that this is one of the rare statutes left for common-law development, as our concurring colleague does. In any event, that common-law development, both for the antitrust laws and any other candidates, is the responsibility of the Supreme Court. See State Oil Co. v. Khan, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (recognizing that only the Supreme Court could jettison the per se rule against maximum pricefixing). All we can do is what we have done here: apply the relevant Supreme Court decisions to the statute to the best of our ability.

. Indeed, in contrast to cases in which a religious employer may be exempted from Title VII liability because they have a bona fide need to discriminate on the basis of a protected characteristic, we note that Ivy Tech's position does not seem to reflect any fundamental desire to be permitted to engage in discrimination on the basis of sexual orientation. To the contrary, Ivy Tech maintains that it has its own internal policy prohibiting such discrimination. It could repeal that policy tomorrow, however, and so we will riot look behind its decision to contest Hively’s claim.