IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13801

_____

D.C. Docket No. 1:16-cv-01460-ODE


GERALD LYNN BOSTOCK,

Plaintiff - Appellant,

versus

CLAYTON COUNTY BOARD OF COMMISSIONERS,

Defendant,

CLAYTON COUNTY,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____


Before ED CARNES, Chief Judge, TJOFLAT, MARCUS, WILSON, WILLIAM
PRYOR, MARTIN, JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM, and
BRANCH, Circuit Judges.

BY THE COURT:

1

A member of this Court in active service having requested a poll on whether this case should be reheard by the Court sitting en banc, and a majority of the judges in active service on this Court having voted against granting a rehearing en banc, it is ORDERED that this case will not be reheard en banc.

ROSENBAUM, Circuit Judge, dissenting from the denial of rehearing en banc:

The issue this case raises—whether Title VII protects gay and lesbian individuals from discrimination because their sexual preferences do not conform to their employers' views of whom individuals of their respective genders should love—is indisputably en-banc-worthy. Indeed, within the last fifteen months, two of our sister Circuits have found the issue of such extraordinary importance that they have each addressed it en banc. *See Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018) (en banc); *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339 (7th Cir. 2017) (en banc).[1]

---

[1] And that's really saying something: in the past five years, the Second Circuit appears to have decided only two cases en banc—including *Zarda*—of the more than 24,000 appeals it terminated during that same period. *See* Westlaw search in CTA2 database: "adv:DA(aft 2008) & PR,PA,JU(en/2 banc)" (last visited July 10, 2018); Administrative Office of the United States Courts, Federal Court Management Statistics of the Courts of Appeals, http://www.uscourts.gov/sites/default/files/fcms_na_appprofile1231.2017.pdf; http://www.uscourts.gov/sites/default/files/data_tables/fcms_na_appsumary1231.2016.pdf; http://www.uscourts.gov/sites/default/files/data_tables/fcms_appeals_summary_pages_december_2015.pdf;http://www.uscourts.gov/sites/default/files/statistics_import_dir/appeals-fcms-summary-pages-december-2014.pdf; http://www.uscourts.gov/sites/default/files/statistics_import_dir/appeals-fcms-summary-pages-december-2013.pdf. In fact, Chief Judge Katzmann has characterized the Second Circuit as having a "longstanding tradition of general deference to panel adjudication." *Ricci v. DeStafano*, 530 F.3d 88, 89 (2d Cir. 2008) (Katzmann, J., concurring in the denial of rehearing en banc); *see also id.* ("Throughout our history we have proceeded to a full hearing en banc only in rare and exceptional circumstances."). Similarly, in the past five years, the Seventh Circuit appears to have decided only sixteen cases en banc, including *Hiveley*, of the more than 15,000 appeals that Circuit has terminated during that time. *See* Westlaw search in CTA7 database: "adv:PR,PA,JU(en /2 banc) & DA(after 2012) % (den! /1 "en banc")" (last visited July 10, 2018); Federal Court Management Statistics of the Courts of Appeals, United States Courts, *supra*. Yet both Circuits found the question at issue here to be of such significance to warrant adding the respective cases to their very exclusive lists of en banc cases.

No wonder.  In 2011, about 8 million Americans identified as lesbian, gay, or bisexual.[2]  *See* Gary J. Gates, *How Many People are Lesbian, Gay, Bisexual, and Transgender?*, The Williams Inst., 1, 3, 6 (Apr. 2011), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Gates-How-Many-People-LGBT-Apr-2011.pdf (last visited July 10, 2018).  Of those who so identify, roughly 25% report experiencing workplace discrimination because their sexual preferences do not match their employers' expectations.[3]  That's a whole lot of people potentially affected by this issue.[4]

---

[2] Most statistics since that time include the number of individuals who identify as transgender.  We have already held that *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), *superseded in part by* The Civil Rights Act of 1991, Tit. I, § 107(a), 105 Stat. 1075 (codified at 42 U.S.C. § 2000e–2(m)), requires the conclusion that Title VII precludes discrimination against transgender individuals because they fail to conform to their employers' stereotypes of how a member of the individual's birth-assigned gender should act or feel.  *See Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011).

[3] *See*, *e.g.*, *2017 Workplace Equality Fact Sheet*, Out & Equal Workplace Advocates, http://outandequal.org/2017-workplace-equality-fact-sheet/ (last visited July 10, 2018) ("One in four LGBT employees report experiencing employment discrimination in the last five years."); *LGBT People in Georgia,* The Williams Inst., https://williamsinstitute.law.ucla.edu/wp-content/uploads/Georgia-fact-sheet.pdf  (last visited July 10, 2018) (finding 25% of LGBT Georgians reported workplace discrimination).  I have been unable to find current statistics providing the percentage of only lesbian, gay, and bisexual individuals (without the inclusion of transgender individuals) who report discrimination in the workplace.  Nevertheless, according to Professor Gary Gates's report for the Williams Institute, *see supra* at 1, "[a]n estimated 3.5% of adults in the United States identify as lesbian, gay, or bisexual and an estimated 0.3% of adults are transgender."

[4] Studies show that this discrimination takes a myriad of forms:  LGBT individuals are not interviewed and hired at the same rate as their heterosexual peers, and they face pay and promotional disparities.  *See* Brad Spears, Christy Mallory, *Documented Evidence of Employment Discrimination & Its Effects on LGBT People*, The Williams Inst., 14 (July 2011), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Sears-Mallory-Discrimination-July-20111.pdf (last visited July 10, 2018).  Studies also show that employment discrimination against LGBT individuals correlates with effects beyond the employment sphere.  For example, LGBT

Yet rather than address this objectively en-banc-worthy issue, we instead cling to a 39-year-old precedent, *Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979), that was decided ten years before *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the Supreme Court precedent that governs the issue and requires us to reach the opposite conclusion of *Blum*.  Worse still, *Blum*'s "analysis" of the issue is as conclusory as it gets, consisting of a single sentence that, as relevant to Title VII, states in its entirety, "Discharge for homosexuality is not prohibited by Title VII." *Blum*, 597 F.2d at 938.[5]  And if that's not bad enough, to support this proposition, *Blum* relies solely on *Smith v. Liberty Mutual Insurance Co.*, 569 F.2d 325 (5th Cir. 1978)—a case that itself has been necessarily abrogated not only by *Price Waterhouse* but also by our own precedent in the form of *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011).[6]  I cannot explain why a majority of our Court is

---

employees who experienced employment discrimination reported higher levels of psychological distress and health-related problems.  *See* Craig R. Waldo, *Working in a Majority Context: A Structural Model of Heterosexism as Minority Stress in the Workplace*, 46 J. of Counseling Psych. 218, 224-28 (1999).

[5] For comparison's sake, this issue spawned 163 pages of analysis from the Second Circuit in *Zarda* and 69 pages of analysis from the Seventh Circuit in *Hively*.

[6] *Smith* concluded that Title VII does not prohibit discrimination against male employees who present as "effeminate." *Smith v. Liberty Mut. Ins.*, 569 F.2d 325, 328 (5th Cir. 1978).  In *Price Waterhouse*, however, the Supreme Court concluded that Title VII did protect from discrimination a woman who acted "macho," 490 U.S. at 235—the same genre of problem that arose in *Smith*.  And in *Glenn*, we found that *Price Waterhouse* requires the understanding that Title VII protects "[a]ll persons . . . from discrimination on the basis of gender stereotype." *Id.* at 1318.

content to rely on the precedential equivalent of an Edsel with a missing engine, when it comes to an issue that affects so many people.[7]

I have previously explained why *Price Waterhouse* abrogates *Blum* and requires the conclusion that Title VII prohibits discrimination against gay and lesbian individuals because their sexual preferences do not conform to their employers' views of whom individuals of their respective genders should love. *See Evans v. Ga. Reg'l Hosp.*, 850 F.3d 1248, 1261-73 (11th Cir.) (Rosenbaum, J., dissenting), *cert. denied*, 138 S. Ct. 557 (2017). Both the Second and Seventh Circuits have likewise concluded that their respective pre-*Price Waterhouse* precedents reaching the same conclusion as *Blum* cannot stand. *See Zarda*, 883 F.3d at 113 (observing that attempts to distinguish *Price Waterhouse* amount to "semantic sleight[s] of hand . . . not a defense . . . a distraction"); *Hively*, 853 F.3d at 350-51 ("It would require considerable calisthenics to remove 'sex' from 'sexual orientation' . . . . The logic of the Supreme Court's decisions, as well as the common-sense reality that it is actually impossible to discriminate on the basis of

---

[7] The pernicious effects of this discrimination are not just limited to those on people, they also drag down the economy by, among other things, reducing worker productivity and increasing turnover. *See* M.V. Lee Badgett, *The Economic Case for Supporting LGBT Rights*, The Atlantic, Nov. 29, 2014, https://www.theatlantic.com/business/archive/2014/11/the-economic-case-for-supporting-lgbt-rights/383131/ (last visited July 10, 2018) (comparing the impact of employment discrimination against LGBT individuals on countries' gross domestic products); M.V. Lee Badgett et al., *The Business Impact of LGBT-Supportive Workplace Policies*, The Williams Inst. (May 2013), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Business-Impact-LGBT-Policies-Full-Report-May-2013.pdf (last visited July 10, 2018).

sexual orientation without discriminating on the basis of sex, persuade us that the time has come to overrule our previous cases that have endeavored to find and observe that line."). I continue to firmly believe that Title VII prohibits discrimination against gay and lesbian individuals because they fail to conform to their employers' views when it comes to whom they should love.

But I dissent today for an even more basic reason: regardless of whatever a majority of this Court's views may turn out to be on the substantive issue that *Bostock* raises, we have an obligation to, *as a Court*, at least subject the issue to the "crucial" "crucible of adversarial testing,"[8] and after that trial "yield[s] insights or reveal[s] pitfalls we cannot muster guided only by our own lights,"[9] to give a

---

[8] I am, of course, aware that petitions for certiorari in *Bostock* and *Zarda* are currently pending before the Supreme Court. But as of the date we as a Circuit voted against granting en banc rehearing in this case and I distributed this dissent to my colleagues—July 10, 2018— nearly three months remain before the Supreme Court is even again in session. And who knows whether the Court will grant either petition? *See* Supreme Court, The Justice's Caseload, https://www.supremecourt.gov/about/justicecaseload.aspx (last visited July 10, 2018) (stating that the Supreme Court usually grants review in only 80 cases of the 8,000 certiorari petitions filed each year). We have been unhindered by similar impediments in the past. *See*, *e.g.*, *In re Anthony Johnson*, 815 F.3d 733 (11th Cir. 2016) (vacating panel order and ordering en banc rehearing where panel had held in abeyance petitioner's application to file second or successive § 2255 motion pending the Supreme Court's impending determination in *Welch v. United States*, 136 S. Ct. 790 (2016), of whether the new rule announced by the Supreme Court in *Johnson v. United States*, 135 S. Ct. 2551 (2015), was retroactively applicable). Even if the Supreme Court grants one or both of these petitions eventually, we could simply hold our en banc proceedings in *Bostock* in abeyance pending the Supreme Court's resolution of the issue.

[9] *Sessions v. Dimaya*, 138 S. Ct. 1204, 1232 (Gorsuch, J., concurring in part and concurring in the judgment) (citation and internal quotation marks omitted).

reasoned and principled explanation for our position on this issue—something we have *never* done.[10]

Particularly considering the amount of the public affected by this issue, the legitimacy of the law demands we explain ourselves. *See* Harvie Wilkinson III, *The Role of Reason in the Rule of Law*, 56 U. Chi. L. Rev. 779, 798 (1989) ("Reason . . . defines the federal judicial system. Nothing in the Constitution requires the written justification of judicial decisions, but a judiciary accountable to reason cannot resort to arbitrary acts.  It requires candor from judges in addressing the strongest arguments against their own views."); *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 472 (1981) (Stevens, J., dissenting) ("[Common law judges'] explanations of why they decided cases as they did provided guideposts for future decisions . . . . Many of us believe that those statements of reasons provided a better guarantee of justice than . . . a code written in sufficient detail to be fit for Napoleon."); Herbert Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 Harv. L. Rev. 1, 19-20 (1959) ("The virtue or demerit of a judgment turns, therefore, entirely on the reasons that support it."); 1 Blackstone, Commentaries 71 (1803) (observing that written court decisions have

---

[10] In *Evans*, 850 F.3d 1248, the panel majority declined to address (or even consider) the substantive Title VII issue and instead dispensed with the case by relying solely on *Blum* and the prior-precedent rule.  And *Bostock* simply invoked *Evans* and *Blum*.  *Bostock v. Clayton Cty. Bd. of Commissioners*, 723 F. App'x 964, 964-65 (11th Cir. 2018).

long been "held in the highest regard" because the public can examine and understand "the reasons the court gave for [its] judgment.").

Despite never offering a reasoned explanation tested by the adversarial process, a majority of this Court apparently believes that *Blum* somehow prophesized the correct post-*Price Waterhouse* legal conclusion in its one-sentence "analysis" that relies solely on authority itself abrogated by *Price Waterhouse*. If the majority truly believes that, it should grant en banc rehearing and perform the "considerable calisthenics" to explain why gender nonconformity claims are cognizable except for when a person fails to conform to the "ultimate" gender stereotype by being attracted to the "wrong" gender. *Hively*, 853 F.3d at 346, 350. And if it doesn't or if it believes—as I and others do—that these "calisthenics" are simply "impossible," *Hively*, 853 F.3d at 350-51, it should not sit idly by and leave victims of discrimination remediless by allowing *Blum* to continue to stand.